Cass Sunstein and Shirley Sunstein v. Commissioner. William M. Brantman and Birdie V. Brantman v. Commissioner.
Sunstein v. Commissioner
Docket Nos. 1698-62, 1726-62.
United States Tax Court
T.C. Memo 1966-43; 1966 Tax Ct. Memo LEXIS 237; 25 T.C.M. (CCH) 247; T.C.M. (RIA) 66043; February 28, 1966
Robert E. Cherry and Warrent L. Schmidt, for the petitioners in Docket No. 1698-62. Luis Kutner, for the petitioners in Docket No. 1726-62. James E. Caldwell, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: The respondent has determined deficiencies in the income taxes due from the petitioners as follows: Year
Deficiency
Docket No. 1698-62
1955
$ 8,097.88
Docket No. 1726-62
1954
24,567.05
Some of the issues raised by these consolidated dockets have been conceded by the petitioners, leaving for our consideration the following: (1) Whether the petitioners in both dockets realized taxable income during the years before the Court from the conversion and unlawful negotiation *238 of certain United States Treasury Bonds, Series E; and (2) whether the petitioners in Docket No. 1726-62 are entitled to a net operating loss deduction in the amount of $41,935.49 for the year 1954. Some of the facts have been stipulated, and they, together with oral stipulations made during the trial, are incorporated herein by this reference. Petitioner, William M. Brantman (hereinafter referred to as Brantman or petitioner Brantman) and Birdie V. Brantman, husband and wife, reside in Chicago, Illinois. They filed joint Federal income tax returns for 1951 and 1954 with the district director of internal revenue, Chicago, Illinois. They also filed an amended return for 1951 with the district director of internal revenue, Chicago, Illinois. Petitioners, Cass Sunstein (hereinafter referred to as Sunstein or petitioner Sunstein) and Shirley Sunstein, husband and wife, also reside in Chicago, Illinois. They filed their joint Federal income tax return for the calendar year 1955 with the district director of internal revenue Chicago, Illinois. During the years herein involved petitioner Brantman was a self-employed accountant and tax counselor with offices in Chicago, Illinois. *239 During 1954 and 1955 Brantman and Sunstein were partners in a wholesale novelty and toy distributing business known as Cass Enterprises (hereinafter sometimes referred to as the partnership). In general Sunstien managed the sales of the business, and Brantman maintained the partnership's books of accounts and handled its financial matters. Cass Enterprises filed its Federal income tax return for the fiscal year ending July 31, 1954, with the district director of internal revenue, Chicago, Illinois. For the period beginning August 1, 1954, and ending April 12, 1955, when the partnership was terminated, no partnership return was filed. On or about August 7, 1954, Sam Becker (hereinafter referred to as Becker) went to the offices of Cass Enterprises and told petitioner Sunstein that he would be interested in making some large purchases of merchandise if he could get help in cashing some bonds. During the previous week Becker had made some small cash purchases from the partnership. Petitioner Sunstein telephoned petitioner Brantman, who had banking connections at the Belmont National Bank (hereinafter sometimes reefrred to as the Bank), and informed him that Becker was a good customer *240 who would make a large cash purchase if certain government bonds could be cashed. After receiving the call Brantman went to the offices of the partnership and met Becker for the first time. Petitioner Brantman took the bonds, United States Treasury Bonds, Series E, and he went to the Belmont National Bank to negotiate them. When Brantman received the bonds in question, they had been endorsed by the payee whose name appeared on the face of the bonds. Petitioner Brantman negotiated the bonds at the Bank by signing his name over the earlier endorsement. The proceeds of these bonds amounted to $15,020, which was paid partly in the form of a cashier's check for $2,500 drawn on the Belmont National Bank to the order of William Brantman, and the balance was paid in cash. Petitioner Brantman gave the cash proceeds to Sunstein who in turn gave it to Becker. Becker then made a cash purchase of merchandise worth $2,200. On several subsequent occasions Becker came into the offices of the partnership, bringing bonds with him. Normally Becker would select merchandise he wanted, and petitioner Sunstein would make up an invoice. Becker would then leave the office to make some other calls in the *241 city. Sunstein would telephone Brantman, who would go to the offices of the partnership, pick up the bonds and negotiate them at the Belmont National Bank. Brantman would then return later in the day with cashier's checks, which were drawn on the Bank. From August 7 to October 6 of 1954, the partnership made cash sales of merchandise to Becker totaling $9,186.70. In five separate transactions from August 7, 1954 to October 22, 1954, petitioner Brantman cashed at the Belmont National Bank 97 United States Treasury Bonds, Series E, and received proceeds totaling $59,956.25. [1]
Except for the first transaction on August 7 when part of the proceeds were paid in cash, the Belmont National Bank paid petitioner Brantman for the bonds by its own cashier's checks. Some of the checks were payable to "Wm. Brantman," and the others were made payable to the various men, who were the payees of the bonds which had been cashed. Petitioner Brantman was the primary endorser of the checks made payable to him, and he was the secondary endorser of the other *242 checks. Brantman cashed all of the checks. After negotiating the bonds, petitioner Brantman would normally take the proceeds to the offices of the partnership. He would leave the checks which were not payable to him with petitioner Sunstein. Sunstein would then give the checks to Becker, when he next came into the office and Becker would leave to secure the endorsement of the payee. Becker would return to the office after the checks had been endorsed. He left these endorsed checks with petitioner Sunstein, who in turn gave them to Brantman, who was the final endoser of all of these checks. Three of the checks cashed by petitioner Brantman were deposited to the account of Cass Enterprises or used to pay a partnership obligation; these checks had a total value of $7,168. Petitioner Brantman also deposited four checks worth $9,874.45 in his personal account at the Amalgamated Trust and Savings Bank. Aside from the transactions noted above, petitioner Brantman gave all of the proceeds from the negotiation of the bonds in question (amounting to $33,727.10) to petitioner Sunstein who in turn gave them to Becker. In February of 1955 an officer of the Belmont National Bank informed *243 petitioner Brantman that the bonds had been stolen bonds. Later that year, in September, a Federal grand jury returned a 97 count indictment against petitioner Brantman, charging that he "did utter and publish as true * * * a falsely forged and counterfeited certificate and writing * * * in violation of Section 495, Title 18, United States Code." After entering a plea of guilty, petitioner Brantman was found guilty in the United States District Court, Northern District of Illinois, and was sentenced to three years in the Federal penitentiary. However, the sentence was suspended, and he was placed on probation for a period of three years. On June 30, 1960, this period of probation was extended for an additional period of two years on order of the court. Petitioner Sunstein was never arrested or indicted in connection with the Treasury Bonds in issue. At the time the bonds were negotiated, he did not know they had been stolen. Petitioner Sunstein never again saw Becker after October of 1954. The first issue for decision (common to both dockets), is whether the petitioners received taxable income from the negotiation of the bonds in question and if so the amount of such income. The *244 respondent advances alternative and mutually exclusive theories on this issue. First, that petitioner Brantman received taxable income of $50,769.55 [2] from the conversion and unlawful negotiation of the bonds in question. The alternate contention is that the partnership realized taxable income of $50,769.55 from the negotiation of the bonds, and that petitioner Sunstein is taxable on his distributive share of such income. [3]
The respondent seeks to tax petitioner Brantman for the full amount of the difference between the proceeds of the bonds and the sales of the partnership to Becker on the grounds that Brantman did not remit these proceeds to Becker but personally kept them. The record refutes and *245 defeats this contention. We have made our finding on this issue without giving any weight to Brantman's testimony. Since the credibility of his testimony is involved at other points in this case, we will give some examples of his evasiveness. Petitioner Brantman testified at one point that none of the cashier's checks were made payable to him, but that they were made payable to "the names on the face of the bonds." Seven checks introduced into evidence were payable to Wm. Brantman." Brantman further testified that he turned over all of the receipts from the checks to Sunstein. When confronted with the checks deposited to his personal account, he explained that he first handed the checks to Sunstein who returned them to him as payment for debts owed to him by the partnership. Petitioner Sunstein also testified about the disposition of the proceeds from the bonds. His testimony was consistent and credible. He testified that he received some proceeds from Brantman and that he gave them to Becker. We are persuaded that Brantman turned over to Sunstein at least part of the proceeds of the bonds, and that Sunstein in turn gave all of these funds (over and above the purchase price of *246 the merchandise) to Becker. We would know with greater certainty what happened to the money in question if Becker had testified, but he was not a witness at the trial. Neither Brantman nor Sunstein had seen Becker after October of 1954 despite the efforts of both men to locate him. In these circumstances we do not think that the failure to produce Becker as a witness weakens the force of petitioner Sunstein's testimony. Aside from the considerable weight we have given to Sunstein's testimony we think the circumstances of the case support the conclusion that at least a large part of the proceeds was returned to Becker. In the first transaction at the Bank on August 7, petitioner Brantman received $12,520 in cash in partial payment for the bonds negotiated. If Becker had not received at least a part of this money we think it very unlikely that he would have returned to the partnership's office on three or four separate occasions to transact more business. We also think it worth noting that Becker left the bonds to be negotiated at the partnership's offices on four occasions after August 7. If he was not receiving some part of the proceeds from these bonds we doubt that he would have *247 entrusted them to either Brantman or Sunstein. Furthermore, Becker secured what purported to be the endorsements of the payees of some of the checks, and instead of cashing them himself, as he easily could have since they were cashier's checks, he gave them to Sunstein with the understanding that Brantman would cash them for him. We are convinced that a large part of the $50,769.55 in question was returned to Becker. At the same time it is certain that Becker did not receive $17,042.45 [4] of this money. On the record in this case we cannot know for certain the precise amount of money remitted to Becker, nor can we know for sure the relations between Becker, Sunstein and Brantman. Exercising our best and admittedly imperfect judgment, we conclude and hold that petitioner Sunstein gave Becker $33,727.10 from the negotiation of the bonds in question. Petitioner Brantman deposited checks worth $9,874.45 in his personal account at the Amalgamated Trust and Savings Bank. This is taxable income to him. Rutkin v. United States, 343 U.S. 130 (1952). *248 Brantman tries to avoid the effect of this rule by arguing that these deposits were in payment of debts owed to him by the partnership. For reasons outlined earlier we give no weight to this uncorroborated testimony. The existence of these loans was not vertified by his partner, Sunstein, and Brantman produced no evidence of such loans. We think that he has not established the existence of these debts. Cf. Berra v. United States, 221 F. 2d 590 (C.A. 8, 1955), affd. 351 U.S. 131 (1956); Charles R. Leaf, 33 T.C. 1093 (1960). The checks totaling $7,168, which were deposited and credited to the account of Cass Enterprises, present a different problem. Petitioner Sunstein did not deposit these checks to the partnership account, but nevertheless we think that he is taxable on one-half of their value. Petitioner Sunstein had constructive control of one-half of these funds even though they were in a partnership account, and he presumably received the economic benefits of this money. Cf. Dawkins v. Commissioner, 238 F. 2d 174 (C.A. 8, 1956), affirming a Memorandum Opinion of this Court on this issue. When the partnership was dissolved *249 in April of 1955, petitioner Sunstein received half of this money as his distributive share of the partnership assets and it is taxable to him as ordinary income. Since we have found that the proceeds from the sale of the bonds less the amounts discussed above were returned to Becker, we do not reach the respondent's alternative contention that the partnership realized taxable income of $50,769.55 from the negotiation of the bonds. The second question for decision is whether the petitioners in Docket No. 1726-62 are entitled to a net operating loss deduction of $41,935.49 in the year 1954. The claimed losses were alleged to have occurred in 1951, and the petitioners seek to carry over the unused part thereof to the year 1954. The only proof of this loss is an entry on the petitioners' 1951 return claiming this loss. It is settled that an entry on a tax return is not evidence that a loss has been incurred. A. Raymond Jones, 25 T.C. 1100 (1956), reversed on other grounds, 259 F. 2d 300 (C.A. 5, 1958). There was no independent proof of the existence of this loss, nor did petitioner Brantman introduce any evidence of a closed and completed transaction *250 during 1951. Cf. Irving Rothbart, 26 T.C. 680 (1956). In fact the only evidence of this loss was Brantman's unsupported testimony, and as stated earlier, we accord it little weight. We sustain the respondent on this issue. Decisions will be entered under Rule 50. Footnotes
1. Becker's purchases were not always on the same day that groups of bonds were cashed, but the record is silent on the reason for this.↩
2. Mistakenly referred to as $50,769.25 in respondent's brief. ↩
3. Under the respondent's alternate theory petitioner Brantman is not taxable on any income realized by the partnership from the transaction in question because the only year before the Court for him is 1954, and the fiscal year involved for the partnership runs from August 1, 1954 to April 12, 1955. See sec. 706(a), I.R.C. 1954; sec. 1.706-1(a)(1), Income Tax Regs.↩
4. This is the sum of the amount which found its way into Brantman's account and the amount obtained by the partnership.↩